# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **DENNY D. FLANARY,** ) | |
| ) | |
| Plaintiff, ) | Case No. 2:04CV00098 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **JO ANN B. BARNHART,** ) | By: James P. Jones |
| **COMMISSIONER OF** ) | Chief United States District Judge |
| **SOCIAL SECURITY,** ) | |
| ) | |
| Defendant. ) | |

In this social security case, I affirm the final decision of the Commissioner.

## *I. Background.*

Denny D. Flanary filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under title II of the Social Security Act, 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2005) ("Act"). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, this court's "inquiry must terminate," and the final decision of the

Commissioner must be affirmed.  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Id.*

Flanary initially applied for benefits on November 9, 1999.  After an administrative hearing, an administrative law judge ("ALJ") found that he could perform his past relevant work and was not disabled.  The Social Security Administration's Appeals Council denied review, and Flanary did not appeal.  Flanary filed a second application for benefits on June 17, 2002, alleging disability as of July 31, 1995.  This claim was denied initially and upon reconsideration.  Flanary received a hearing before an ALJ on September 17, 2003, at which he amended his disability onset date to November 1, 2001.  By decision dated February 10, 2004, the ALJ found that the plaintiff was not disabled within the meaning of the Act.  The Social Security Administration's Appeals Council denied review, and the ALJ's opinion constitutes the final decision of the Commissioner.

Plaintiff filed this action on November 4, 2004, seeking judicial review of the Commissioner's decision denying his second application for benefits.  The parties have briefed the issues, and the case is ripe for decision.

## *II. Facts.*

The plaintiff was fifty-six years old at the time of the ALJ's decision. He is a high school graduate and has past relevant work experience in a coal mine as a roof bolter, miner helper, trackman-motorman, and scoop operator. The ALJ concluded that these were semiskilled jobs involving medium exertion. Flanary has not worked since 1995, and his insured status for purposes of entitlement to disability insurance benefits expired on June 30, 2002.

In rendering his decision, the ALJ considered medical evidence from Maurice E. Nida, D.O.; Danny Mullins, M.D.; B. Wayne Lanthorn, Ph.D.; and Edward Latham, Ph.D. The ALJ also considered the opinions of the state agency physicians, Donald R. Williams, M.D., and Richard Surrusco, M.D., who based their findings on a review of the evidence in Flanary's administrative record.

Dr. Nida, the primary care physician, treated Flanary from February 2, 2000, to February 25, 2004. On February 2, 2000, Flanary complained to Dr. Nida of chest pain that sounded like angina. A Cardiolyte stress test did not show any abnormalities, but blood tests revealed elevated sugar levels. On January 23, 2002, Dr. Nida evaluated Plaintiff for his non-insulin dependent diabetes and reported that he was doing quite well. Flanary noted that he felt well overall, but that his arthritis had been acting up. Dr. Nida diagnosed diabetes, hypertension, and worsening

osteoarthritis. Dr. Nida prescribed Ultracet for pain and renewed various other prescriptions. On March 27, 2002, Dr. Nida evaluated the plaintiff and reported that he was doing quite well and had no major problems, although he complained that his osteoarthritis hurt all of the time. Dr. Nida renewed the Ultracet prescription and started Flanary on Bextra for his arthritic condition.

On June 17, 2002, Dr. Nida completed a mental and physical medical assessment of the plaintiff's ability to do work-related activities. In the physical assessment, Dr. Nida opined that Flanary could only lift or carry a maximum of five pounds and could only stand or walk a total of thirty minutes in an eight-hour day. Dr. Nida also concluded that Flanary was limited in reaching, handling, feeling, pushing, and puling. These limitations were based on Flanary's diagnosis of osteoarthritis. In the mental assessment, Dr. Nida opined that Flanary had only a fair ability to interact appropriately with the public, supervisors, and co-workers; respond to work pressures; and follow work rules. A "fair" ability to function means that the plaintiff's "[a]bility to function in [these] area[s] is seriously limited, but not precluded." (R. 145.)

On July 22, 2002, Dr. Nida again reported that the plaintiff was doing fairly well and was not having any major problems. Flanary did complain of some shortness of breath and his blood pressure was up, but a cardiac catheterization did

not show anything of concern. Dr. Nida diagnosed non-insulin dependent diabetes, hypertension, and osteoarthritis, and renewed various prescriptions. On October 23, 2002, Dr. Nida evaluated the plaintiff and concluded that he was doing well. Flanary's blood pressure had improved since his last visit, his blood sugar ran between 115 and 130, and he had no fever, chills, shortness of breath, chest pain, or abdominal pain. Dr. Nida again renewed Flanary's various prescriptions. On January 22, 2003, Dr. Nida evaluated plaintiff and reported that he was doing fairly well and had no major problems. On April 21, 2003, the plaintiff complained to Dr. Nida of mild shortness of breath and mild pain but no changes in his symptoms, and an evaluation showed that plaintiff's lungs were clear with no wheezes, rales, or rhonchi.

On May 13, 2003, the plaintiff complained to Dr. Nida of an eight-day history of right knee pain. Dr. Nida reported that there was no obvious swelling, warmth, or tenderness, and diagnosed a possible Baker's cyst. On May 16, 2003, an ultrasound of plaintiff's knee showed no abnormality, but an X ray showed chondrocalcinosis. On May 19, 2003, Flanary again complained of right knee pain, and Dr. Nida referred him to Dr. Mullins for evaluation. Dr. Mullins reported that Flanary had tenderness on palpation and pain on hyperflexing, but otherwise had full range of motion and no instability. He also noted that an MRI dated May 23, 2003, revealed that the posterior horn medial meniscus was torn and that there were degenerative type changes.

On June 3, 2003, Dr. Nida completed a second mental medical source statement stating that Flanary had moderate restrictions in his ability to understand and remember simple instructions, understand and remember detailed instructions, and make simple, work-related decisions. Dr. Nida also concluded that Flanary had marked restrictions in his ability to interact with the public, interact appropriately with supervisors and coworkers, respond appropriately to work pressures, and respond appropriately to changes in routine work settings. When asked to supply the medical findings supporting this assessment, however, Dr. Nida simply responded "see notes."

On August 27, 2003, Dr. Lanthorn, a licensed clinical psychologist, performed a psychological evaluation of Flanary. Dr. Lanthorn found that the plaintiff was alert and well-oriented, had adequate or better hygiene, and achieved a verbal and performance I.Q. score of 85. His full-scale I.Q. score was 84, which places him in the low-normal intelligence range. Dr. Lanthorn diagnosed a moderate major depressive disorder, a pain disorder associated with both physical and psychological factors, and possible anxiety disorder. Dr. Lanthorn completed a mental medical assessment of ability to do work-related activities based on this psychological evaluation, in which he concluded that Flanary was seriously limited in his ability to follow work rules, relate to co-workers, deal with the public, use judgment in public,

maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. Dr. Lanthorn also opined that Flanary had unlimited ability to understand, remember, and carry out simple job instruction, and good to fair abilities to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.

Dr. Latham, another psychologist, examined Flanary on October 14, 2003. Dr. Latham concluded that Flanary appeared able to understand, retain, and follow simple instructions and do routine tasks. Dr. Latham noted that Flanary's attention and concentration skills appeared to be sufficient for simple tasks, but that his ability to relate interpersonally and handle everyday stress appeared mildly impaired. Dr. Latham completed a mental medical assessment of Flanary's ability to do work-related activities that mirrored Dr. Lanthorn's assessment in all material respects.

Dr. Nida examined the plaintiff on September 23, 2003, and diagnosed right knee pain, right hip pain, left shoulder pain, osteoarthritis, diabetes, hypertension, GERD, BPH, and gout. At the request of Flanary's attorney, Dr. Nida wrote a letter on October 20, 2003, summarizing these findings and predicting that none of the conditions would improve in the near future.

Drs. Williams and Surrusco, physicians for the state agency, conducted a review of the evidence of record and concluded that Flanary could perform medium work. They found that the plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently, could stand or walk for six hours in an eight hour day, could sit for six hours in an eight our day, and had an unlimited ability to push and pull. They also opined that he had no impairment in his ability to climb, balance, stoop, kneel, crouch, or crawl. Drs. Williams and Surrusco noted that the severe restrictions in Dr. Nida's medical assessments were not supported by his reported physical examinations which showed no significant abnormalities.

At his administrative hearing, Flanary testified that he cares for his brother who had a liver transplant and his brother's son who is mentally retarded. He also testified that he has an elderly aunt whom he visits everyday and drives to the grocery store on occasion. He attends church and socializes with friends. In his daily activities questionnaire, Flanary reported that he shops for groceries once a week without help. His hobby is repairing clocks, and he reads the newspaper daily. He socializes with friends, has never had psychiatric treatment, and gets along well with family, friends, and coworkers.

Based on the evidence, the ALJ determined that Flanary's non-insulin-dependent diabetes, hypertension, and arthralgias are "severe" in combination but that

he has the residual functional capacity to perform medium work. The ALJ noted that Flanary's allegations regarding his limitations were not totally credible. The ALJ concluded that Fanary's conditions do not prevent him from performing his past relevant work. In making these determination, the ALJ focused on medical evidence during the period of November 1, 2001, the disability onset date, and June 30, 2002, the date Flanary was last insured for DIB.

### III. Analysis.

Flanary argues that the ALJ erred by not giving controlling weight to the opinions of his treating physician, by improperly determining Flanary's residual functional capacity, and by failing to summon a vocational expert to testify as to the effects of nonexertional impairments on Flanary's ability to perform work.

I find the plaintiff's arguments unpersuasive. First, the ALJ did not err in rejecting Dr. Nida's physical and mental medical assessments. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining doctors, which constitute a major part of the proof in disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged

disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2000). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

While the regulations provide that a treating source's opinion on the nature and severity of impairments will be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, "[b]y negative implication, if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. Dr. Nida's assessments indicated severe restrictions in Flanary's ability to work, but these findings are not supported by his reported physical examinations. Dr. Nida's treatment notes do not document any impairment on or prior to June 30, 2002, the date he was last insured, that would impact Flanary's ability to sit, stand, or walk. Nor do they document any complaints, signs, or symptoms of a depressive or other mental disorder. Indeed, many of Dr. Nida's treatment notes indicate that Flanary was doing quite well and not having any major problems. Therefore, the ALJ did not err in rejecting the unsupported position taken by Dr. Nida.

Secondly, the ALJ's determination that Flanary retained the residual functional capacity to perform medium work is supported by substantial evidence. Drs. Williams and Surrusco, the State Agency physicians, both concluded that Flanary was capable of performing medium work, and such a finding is also consistent with the objective medical findings, which were minimal. Dr. Nida's medical assessments did indicate severe restrictions in Flanary's work capabilities, but, as explained above, these limitations are not supported by Dr. Nida's reported medical examinations and are thus not controlling.

The orthopedic specialist who examined Flanary's right knee problem, Dr. Mullins, found that Flanary had full range of motion and no instability. Furthermore, Flanary's knee problem arose in May of 2003, which is well beyond the date last insured. Similarly, the psychological evaluations performed by Drs. Lanthorn and Latham occurred in August and October 2003, more than one year after Flanary was last insured for benefits. Thus, the ALJ was justified in his conclusion that Drs. Lanthorn and Latham's psychological assessments were of no probative value for the period at issue. The record contains no evidence of any complaints, signs, or symptoms of depression or any other emotional disorder on or prior to June 30, 2002.

Flanary did testify at his hearing that he suffered from knee, lower back, and hip pain; could stand for only fifteen minutes at a time before his pain increased;

could sit for only fifteen to twenty minutes before he must change positions; and could only lift approximately five to seven pounds. However, the ALJ found that Flanary's subjective complaints were not credible to the extent alleged. In making this determination, the ALJ noted that Flanary's blood sugar levels are well controlled with medication, that his back and joint pains are relatively well controlled as he consistently reported to Dr. Nida that he was doing well, and that his complaints of knee pain did not arise until after the date he was last insured for DIB. Although a claimant's allegations about pain may not be discredited solely because they are not subtantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence. *See Craig*, 76 F.3d at 595. Given the dearth of objective medical findings from the period in which Flanary was covered for benefits, I find that the ALJ did not err in concluding that Flanary's subjective complaints were not entirely credible. Accordingly, I find that substantial evidence supports the ALJ's determination that Flanary has the residual functional capacity to perform medium work.

Lastly, I find that the ALJ's failure to summon a vocational expert to testify as to the effect of nonexertional impairments on Flanary's ability to perform his past relevant work does not constitute an abuse of discretion. Admittedly, when a claimant demonstrates the existence of nonexertional impairments, expert vocational

-12-

testimony is required to prove that, despite the claimant's exertional and nonexertional impairments, specific jobs exist in the national economy which the plaintiff can perform. *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983). However, this expert vocational testimony is not required unless the ALJ proceeds to the fourth step of the sequential evaluation process used to decide whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2005) (setting forth the four steps used to decide whether a claimant is disabled). This is because nonexertional impairments have individualized effects on a claimant's work capabilities which preclude reliance on the grid regulations in determining whether a claimant can make an adjustment to other gainful work in the national economy. *See Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984). As the defendant noted in her brief, the ALJ determined that Flanary was capable of performing his past relevant work, and thus found that Flanary was not disabled at the third step of the sequential evaluation process used to decide whether a claimant is disabled rather than the fourth. *See* 20 C.F.R. § 404.1520.

Furthermore, even if the required use of a vocational expert applied at the third stage, the Fourth Circuit has made clear that not every ailment of a "nonexertional" nature constitutes a "nonexertional impairment." *Smith v. Schweiker*, 719 F.2d at 725. One district court in this circuit has explained that

> the proper inquiry is whether a given nonexertional condition affects the claimant's residual functional capacity to perform work of which he is exertionally capable. If the condition has that effect, it is properly viewed as a "nonexertional impairment," thereby requiring the use of a [vocational expert]. If it does not, no testimony from a [vocational expert] is necessary.

*Baker v. Chater*, 957 F. Supp. 75, 81 (D. Md. 1996) (citing *Smith v. Schweiker*, 719 F.2d at 725). Substantial evidence from the record supports a finding that Flanary's nonexertional conditions do not preclude him from performing medium work. There was no evidence of Flanary's alleged psychological impairments until well after June 30, 2002, the date that his entitlement to disability insurance benefits expired. The minimal objective medical evidence suggests that Flanary's allegations of pain were exaggerated. Thus, I find that plaintiff's nonexertional conditions amounted to less than an impairment, and the ALJ was justified in determining that Flanary could perform medium work without the testimony of a vocational expert.

### *IV. Conclusion.*

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted. An appropriate judgment will be entered.

DATED: November 9, 2005

/s/ JAMES P. JONES
Chief United States District Judge